## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ROBIN ADAMS and CYNTHIA L. SCOTT,**

      **Plaintiffs,**

**v.**                                    **Case No: 8:23-cv-789-MSS-NHA**

**PROGRESSIVE EXPRESS INSURANCE COMPANY,**

      **Defendant.**

_____

## <u>ORDER</u>

**THIS CAUSE** comes before the Court for consideration of Defendant Progressive Express Insurance Company's Motion for Summary Judgment, (Dkt. 28), Plaintiffs' response thereto, (Dkt. 32), Defendant's reply, (Dkt. 34), and the Parties' Joint Stipulation of Undisputed Material Facts. (Dkt. 33) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **DENIES** Defendant's Motion.

## I.  BACKGROUND

### a.  Procedural Background

On April 11, 2024, Plaintiffs Robin Adams and Cynthia L. Scott filed this bad faith action against Defendant Progressive Express Insurance Company ("Progressive"). (Dkt. 1) Plaintiffs allege Progressive violated its duty of good faith under Florida law in handling the defense of claims against Plaintiffs. (<u>Id.</u>) Plaintiffs

allege they are liable for two final judgments totaling more than $1,000,000 because of Progressive's bad faith. (Id.) Progressive moves for summary judgment on Plaintiffs' claims. (Dkt. 28)

### b. Undisputed Facts

The following facts are undisputed in this record for the purpose of resolving the motions. On July 16, 2017, Adams was involved in a motor vehicle accident with Gonzalo Buergo and Shaleen Suarez in Pinellas County, Florida. (Dkt. 28-1) Buergo was operating a 1997 Jeep Grand Cherokee with Suarez in the front-passenger seat. (Id.) Adams was operating a 2003 Buick Rendezvous, which he co-owned with Scott. (Id.) While Buergo was stopped at a stoplight on East Central Avenue, Adams rearended Buergo. (Id.) Adams was cited for careless driving. (Id.) Buergo and Suarez did not report any injuries at the scene of the accident. (Id.) At the time of the accident, Progressive insured Adams and Scott under an automobile liability policy that provided $10,000 per person/$20,000 per accident in bodily injury ("BI") coverage. (Dkt. 1 at ¶¶ 4–5)

On July 17, 2017, the day after the accident, Buergo and Suarez retained the law firm of Salter Healy Bassett & Rivera ("Salter Healy") to represent them in connection with the accident. (Dkt. 28-2) On July 18, 2017, Progressive received its first notice of the loss from Erica Jones, a paralegal at Salter Healy. (Dkt. 28-3 at PRG 01, 4:28 PM; Dkt. 28-4) Jones advised that her firm represented Buergo and Suarez. (Dkt. 28-4) Jones reported that Buergo complained of neck pain, left hip pain, and headaches, and that Suarez complained of neck pain and bilateral shoulder pain. (Id.)

Jones further advised that Buergo and Suarez did not visit any emergency room but instead proceeded with chiropractic treatment. (Id.)

On July 19, 2017, Progressive assigned Cheslea Fundora to the claim. (Dkt. 28-3 at PRG 03, 12:40 PM) She called Adams to ask for his version of the facts of the accident and confirmed that he rear-ended the claimants. (Id.) Pursuant to Adams' statements, Fundora determined that Adams was liable for the accident. (Id. at PRG 04, 1:12 PM) Also on July 19, 2017, Progressive received a letter of representation from Robert Healy at Salter Healy which requested statutory insurance disclosures within 30 days. (Dkt. 28-5)

Four weeks later, on or about August 16, 2017, Progressive assigned the BI claims to Karen Sanchez. (Dkt. 28-3 at PRG 09, 12:20 PM) Sanchez reviewed the facts, noted it was a moderate to hard impact, and set the bodily injury reserves for both Buergo and Suarez at the $10,000 per person policy limit. (Id. at PRG 09–11) She attempted to contact Salter Healy and left a message requesting information about the claimants' injuries. (Id.) She also left a message for Adams in which she asked him to verify his insurance coverages and to provide information about Scott. (Id. at PRG 10, 12:27 PM) Sanchez then called Direct General Insurance Company ("Direct General"), Buergo and Suarez's insurer. (Id. at PRG 11, 12:41 PM) During this phone call, Sanchez learned that Direct General was investigating a potential coverage issue. (Id.) Until the investigation concluded, Direct General could not confirm that Buergo and Suarez would receive personal injury protection ("PIP") benefits from Direct General. (Id.)

On August 17, 2017, Sanchez sent letters to Adams and Scott that advised them of the claims being made against them. (Dkt. 28-6) The letters advised Adams and Scott of their coverages and provided affidavits for them to execute to verify their insurance coverages. (Id.) Additionally, Sanchez sent a letter to Healy acknowledging his representation. (Dkt. 28-7) Sanchez requested that Healy forward documents supporting his clients' claims to Progressive, including his clients' medical bills, medical reports, and a list of their medical providers. (Id.) Sanchez enclosed medical authorization forms for Buergo and Suarez to execute so Progressive could obtain their medical records for itself. (Id.) Sanchez sent statutory insurance disclosures in response to Healy's letter of representation, along with a copy of the policy. (Dkt. 28-8) Adams and Scott were copied on the letter. (Id.)

On August 30, 2017, Sanchez received a time-limited demand from Daniella Rivera, an employee of Salter Healy, dated August 28, 2017. (Dkt. 28-3 at PRG 012, 6:08 PM; Dkt. 28-9) Therein, Rivera demanded the $10,000 BI policy limits for Buergo and Suarez ($20,000 total) within 30 days of the date of the letter, *i.e.*, September 27, 2017. (Dkt. 28-9) Enclosed with the demand was the police report, property damage photos, MRI reports, and executed medical authorizations for the claimants' providers, Path Medical and St. Pete MRI. (Id. at 3–30) The MRI reports indicated that Buergo presented to St. Pete MRI on July 31, 2017 for cervical, lumbar, thoracic, and brain MRIs. (Id. at 13–20) The reports indicated that Buergo complained of headaches, neck pain, and back pain after the accident. (Id.) The MRI reports found intervertebral disc desiccation, disc herniations, and disc bulges throughout Buergo's

4

spine. (Id.) However, the brain MRI was normal. (Id. at 19–20) Suarez also presented to St. Pete MRI on July 31, 2017 for cervical, lumbar, and right knee MRIs, complaining of low back pain, neck pain, and right knee pain after the accident. (Id. at 21–26) The MRI reports found intervertebral disc desiccation, disc bulges, and disc herniations in Suarez's lumbar spine and a disc bulge in her cervical spine. (Id.) The MRI of Suarez's right knee showed an anterior cruciate ligament ("ACL") sprain. (Id. at 25–26) Rivera stated as follows:

> [W]e have enclosed executed [medical authorizations] so that you may obtain additional records and bills from my clients' medical providers. Neither Mr. Buergo and Ms. Suarez have had prior injuries. It is clear that the value of these claims are well in excess of the available policy limits.
>
> As such, please deliver a check for your insured's bodily injury policy limits, and a fully sworn disclosure of all information and materials pursuant to Florida Statute §627.4137 . . . . Please deliver the affidavits and the policy limits to my office within thirty (30) days from the date of this letter . . . . Upon receipt of these materials, I will meet with my client to review the materials and I will let you know whether we will be able to complete the settlement. Additionally, final settlement is dependent upon permission to settle from my client's UM carrier.

(Id.) The demand letter only mentioned Adams and referred to Progressive's "insured." (Id.) It did not mention Scott.

On September 2, 2017, Sanchez sent a letter to Adams enclosing the demand.[1]

(Dkt. 28-10) In the letter, Sanchez stated:

> I am handling the Bodily Injury claim made against you arising out of an automobile accident in which you were involved on July 16, 2017. Policy Number 02368359-9 . . . provides coverage in the amount of $10,000.00 each person and $20,000.00 each occurrence for Bodily Injury liability . . . .

---

[1] Adams testified that he was Scott's caregiver and handled any communications with Progressive. (Dkt. 28-11 at 35:13-36:2)

We are in receipt of a Bodily Injury demand requesting payment for damages in the amount of $10,000.00. I am enclosing a copy of the demand letter for your review. I am required to answer the demand by 09/26/2017 and will provide you with a copy of our response to the demand. If you would like to discuss Progressive's case evaluation and provide us with your thoughts and input with regard to the settlement demand, I would appreciate hearing from you before the due date of 09/26/2017.

The damages claimed by [Burgo and Suarez] in this matter could exceed the limits of Bodily Injury coverage available under the above-referenced Progressive policy and you could be held personally responsible for any verdict over and above your coverage, if one were entered against you. You have the right to employ an attorney of your choice, at your own expense, to represent your interests and advise you in this matter. We will be pleased to cooperate with that attorney, if you choose to hire one.

(Id.)

On September 22, 2017, with only three business days left before the deadline to respond to the demand letter, Sanchez contacted Path Medical for the first time. (Dkt. 28-3 at PRG 12, 9:55 AM; Dkt. 28-13) She faxed them a cover letter along with the medical authorizations for Buergo and Suarez. (Dkt. 28-13) In the cover letter, Sanchez advised Path Medical that she needed all medical records as set forth in the authorizations and requested that Path Medical respond promptly, as Sanchez needed the information for an insurance claim. (Id.) Path Medical told Sanchez it typically takes 24 to 48 hours for them to respond. (Dkt. 28-21 at 64–65) On that same day, Sanchez called Direct General to request any Path Medical records Direct General may have possessed. (Dkt. 28-3 at PRG 13, 10:09 AM; Dkt. 28-14) She faxed them a letter like the one sent to Path Medical, along with the medical authorizations. (Id.) During Sanchez's phone call with Direct General, Sanchez learned that Direct

6

General had received the claimants' records and billing; Direct General possessed the records Sanchez requested. (Dkt. 28-3 at PRG 13, 10:09 AM) Direct General also told Sanchez that PIP coverage was still pending for the claimants. (Id.)

That same day, Sanchez called Salter Healy's office and spoke to Jones and Rivera.[2] (Id. at PRG 13, 10:26 AM; Dkt. 28-15) Sanchez asked Jones for an extension of time and requested additional records. (Id.) Jones advised Sanchez that all Salter Healy had was "the MRIs." (Id.) Later that day, Rivera sent an internal email to Robert Healy to inform him that Sanchez had requested a thirty-day extension to respond to the demand. (Dkt. 28-15) In the email, Rivera stated: "I told her that I was not agreeable to a 30 day extension and that I would need to speak to the clients about granting any type of extension." (Id.) Describing her conversation with Sanchez to Healy, Rivera said she told Sanchez that Sanchez had "enough in her possession to tender the limits," to which Sanchez responded that "she really needs the records from Path and that she will take any kind of extension she can get." (Id.) Rivera stated to Healy: "We did get the MRI bills which are high, $7,350 and $9,800 . . . I am going to send her the bills and confirm that she knows the PIP situation." (Id.) Rivera also asked Healy: "Do you want me to get the Path records [and] bills and [sent] to her?" (Id.) Also, Rivera asked Healy, "Do you want to give her any type of extension?" (Id.)

---

[2] Sanchez's claim notes indicate she only spoke to Jones on September 22, 2017. (Dkt. 28-3 at PRG 13, 10:26 AM) However, in Rivera's email to Robert Healy later that same day, Rivera indicates that Rivera also spoke to Sanchez. (Dkt. 28-15) The Court assumes that Sanchez spoke to both Jones and Rivera on September 22, 2017, and finds this factual question immaterial for purposes of resolving the Motion.

Later that day, after Sanchez's conversation with Rivera, Sanchez sent a response letter to the August 28th demand. (Dkt. 28-16) In the letter, Sanchez stated:

> Please accept this letter as my formal response to your demand letter dated August 28, 2017. Based on the information provided, we are unable to meet your demand at this time. The records received from your office were diagnostic tests only. We have no records indicating what your client's injury complaints were or any medical diagnosis from his treatment providers.
>
> We have utilized the Medical Authorization form you provided but have not received any records or billing from Path Medical. We have also sent a request to the PIP carrier for their records received. The PIP coverage for your client is still pending and we will also need to know whether coverage will be afforded or not in order to determine the out-of-pocket specials.
>
> Once we have received all the treatment records for your client, we may be in a better position to fully evaluate your client's claim. Any assistance you can give us to expedite getting these records would be appreciated. We want to amicably resolve this for both your client and our insured.

(Id.) Adams was copied on the letter. (Id.)

On September 22, 2017, Sanchez set her evaluation range for the claims at $1 each, which Sanchez testified was a "filler number" because she "reviewed what [she] had and there was nothing to evaluate." (Dkt. 28-3 at 13, 2:48 PM; Dkt. 28-21 at 45:1-7)

On September 25, 2017, Progressive received correspondence from Rivera dated September 22, 2017. (Dkt. 28-3 at PRG 14, 11:26 AM; Dkt. 28-17) Therein, Rivera enclosed MRI bills from St. Pete MRI that showed charges of $9,800 for Buergo and $7,350 for Suarez. (Id.) Rivera stated that the claimants may not be afforded PIP benefits by Direct General for the accident. (Id.) Rivera demanded compliance with her August 28th demand. (Id.)

On September 28, 2017, Sanchez called Direct General, who advised that the PIP coverage investigation was still ongoing and that a meeting was scheduled for October 5, 2017 to discuss whether Direct General would afford PIP coverage. (Dkt. 28-3 at PRG 15, 2:38 PM) There is no evidence in the record that Sanchez followed up on her request for records from Direct General during this phone call. That same day, Sanchez called Salter Healy and spoke with Jones, who granted an extension to respond to the demand to October 5, 2017. (Id. at PRG 15, 3:04 PM) According to her claim note, Sanchez told Jones that Progressive still did not have any medical records to evaluate. (Id.) Sanchez advised that MRIs were diagnostic tests, "not a diagnosis." (Id.) Sanchez advised that she needed records from the claimants' doctors detailing their complaints and diagnoses. (Id.) According to Sanchez's claim note, Jones advised that her office had requested records, but they had not received the records either. (Id.) Jones stated that Rivera's position was that the MRIs were "sufficient enough to tender the limits." (Id.) Sanchez noted that Progressive does not evaluate injury claims based solely on MRIs. (Id.) Sanchez further noted that, if possible, she would get some records before the demand due date, evaluate them, and respond to the demand before the amended deadline. (Id.)

That same day, Rivera sent a letter to Sanchez dated September 25, 2017 confirming the extension to October 5, 2017 and stating that this was "the only extension that we can provide to you." (Dkt. 28-18) On September 29, 2017, Rivera sent Sanchez another letter enclosing "all prior correspondence," and stated that the October 5, 2017 deadline remained in place. (Dkt. 28-19)

On October 5, 2017, Sanchez called Jones and advised that she could not make an offer based only on the MRI reports and without any medical records. (Dkt. 28-3 at PRG 17, 3:06 PM) That same day, Sanchez sent a letter to Rivera and stated:

> Please accept this letter as my formal response to your demand letter dated September 25, 2017. Based on the information provided, we are unable to meet your demand at this time. The records received from your office were diagnostic tests only. We have no records indicating what your client's injury complaints were or any medical diagnosis from his treating providers.
>
> We have utilized the Medical Authorization form you provided but have not received any records or billing from Path Medical. We have also sent a request to the PIP carrier for any records they may have received.
>
> In order to complete a full evaluation of your client's injuries, we need the following:
>
> >All medical records and billing from Path Medical
> >All medical records and billing from Lisa Krawczun, DC, who ordered the MRI's
> >Any other medical records and billing for treatment from this loss not listed above
>
> Once we have received all the treatment records for your client, we may be in a better position to fully evaluate your client's claim.

(Dkt. 28-20) Adams was copied on the letter. (Id.) The amended deadline expired without the acceptance of the demand or a counter-offer.

On December 11, 2017, Adams notified Progressive that he and Scott had been served with lawsuits, which were filed by Buergo and Suarez on November 14, 2017. (Dkt. 28-22)

On December 12, 2017, Progressive assigned the claims to Tiffany Williams. (Doc. 28-3 at PRG 18, 7:24 AM) That same day, Williams sent letters to Adams and Scott, advising them:

> I've learned that one or more parties have damages from the accident on July 16, 2017. Unfortunately, the value of those damages may be more than are covered by your policy . . . .
>
> If the value of the damages exceeds these coverage amounts, you'll be responsible for paying the difference . . . .
>
> If you receive notice of a lawsuit filed against you, please let me know and we'll provide an attorney to represent you.
>
> You also have the right to hire your own attorney at any time, at your own expense, to represent you for any damages not covered by your policy. If you choose to do that, please let me know and we'll work with them.
>
> We don't yet know the total value of all the damages. This letter is just to let you know that the damages may be more than your policy covers; I'll keep you updated as I learn more. These situations can be confusing, so please call me if you have any questions.

(Dkt. 28-23) On December 14, 2017, Progressive retained counsel to defend the insureds and noted a plan of action to "obtain complete records in discovery." (Dkt. 28-3 at PRG 19–20)

On February 20, 2018, Williams received and reviewed Buergo and Suarez's interrogatory responses along with billing records from Path Medical and St. Pete MRI. (Id. at PRG 22, 8:22 PM and 10:10 PM; Dkt. 28-24) The interrogatory responses revealed that Buergo and Suarez did not have PIP coverage and had medical expenses in the amounts of $25,998 and $23,404, respectively. (Dkt. 28-24) Williams submitted the bills to Mitchell Decision Point ("MDP"). (Dkt. 28-3 at PRG 22, 9:52 PM; Dkt. 28-25 at 29:6-8) MDP is a medical pricing resource used by PIP carriers to assess the required reimbursement rates for treatment provided. (Dkt. 32-1 at 8)

11

On April 3, 2018, Williams called Adams and advised that Progressive was trying to obtain records to have a clear picture of the claimants' treatment, as no treatment records were received pre-suit. (Dkt. 28-3 at PRG 23, 1:46 PM) That same day, Williams sent email correspondence to Progressive's defense counsel inquiring if additional records had been received through discovery. (Id. at PRG 23, 1:53 PM)

On April 16, 2018, Williams received records of Suarez's treatment from Progressive's defense counsel that were obtained in discovery. (Id. at PRG 24, 6:05 PM) Upon review of the medical records, which confirmed Suarez's injuries, Williams evaluated Suarez's BI claim and noted that "this is clear tender." (Id.) Williams also noted that "while bills [were] somewhat excessive" and the "reasonable [amount] exceeds our insured's [policy limits]," she would tender the $10,000 BI policy limits. (Id.) That same day, Williams emailed Progressive's defense counsel and asked whether discovery records had been received for Buergo. (Id. at PRG 26, 6:08 PM)

On April 17, 2018, Progressive's defense counsel emailed Williams records received from Buergo in discovery. (Id. at PRG 26, 5:25 PM) Williams noted that while she had "minimal treatment records," she was able to gather enough information from the billing codes to make the decision to tender the $10,000 BI policy limits. (Id.)

On April 18, 2018, Progressive's defense counsel sent letters to Salter Healy that enclosed checks for the $10,000 BI limits to Buergo and Suarez ($20,000 total), along with proposed releases and stipulated dismissals with prejudice. (Dkt. 28-26) On April

20, 2018, Salter Healy returned the checks and rejected Progressive's tender of the BI limits. (Dkt. 28-27)

On July 5, 2022, a final judgment was entered in favor of Buergo against Adams and Scott after a trial in the amount of $916,832.19. (Dkt. 1-1) On January 17, 2023, a final judgment was entered in favor of Suarez against Adams and Scott pursuant to a binding arbitration in the amount of $353,212.10. (Dkt. 1-2) On April 11, 2023, Adams and Scott filed this bad faith action. (Dkt. 1)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

13

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

The Court must determine whether Plaintiffs' claim that Progressive failed to handle their defense in good faith may be resolved as a matter of law. First, Progressive argues § 624.155(4)(a), Florida Statutes (2023), precludes Plaintiffs' bad faith action. (Dkt. 28 at 16–19) Next, Progressive maintains the undisputed facts establish as a matter of law that it acted in good faith in handling Plaintiffs' defense. (Id. at 19–23) Finally, Progressive argues it cannot be found to have acted in bad faith under Florida law because it was never presented a realistic opportunity to settle the claims against Plaintiffs. (Id. at 23–25) In response, Plaintiffs argue that § 624.155(4)(a) does not preclude this action because it does not apply to insurance contracts that were formed on or before March 24, 2023. (Dkt. 32 at 10–12) Next, Plaintiffs assert a genuine

14

dispute of material fact exists as to whether Progressive violated its duty of good faith. (Id. at 12–17) In support of their position, Plaintiffs provide an affidavit from an expert who testifies that Progressive's handling of Plaintiffs' defense violated industry standards and its duty of good faith. (Dkt. 32-1) Finally, Plaintiffs dispute Progressive's claim that it never had a realistic opportunity to settle. (Dkt. 32 at 17–20) Instead, Plaintiffs argue the evidence would allow a reasonable jury to conclude that Progressive failed to pursue settlement options. (Id. at 19–20)

### a. Section 624.155(4)(a), Florida Statutes, does not preclude Plaintiffs' bad faith action.

In the Motion, Progressive argues § 624.155(4)(a), Florida Statutes, precludes Plaintiffs' bad faith action as a matter of law. Section 624.155(4)(a) states,

> An action for bad faith involving a liability insurance claim, including any such action brought under the common law, shall not lie if the insurer tenders the lesser of the policy limits or the amount demanded by the claimant within 90 days after receiving actual notice of a claim which is accompanied by sufficient evidence to support the amount of the claim.

Progressive contends that it did not have both "actual notice" of the claims and "sufficient evidence to support the amount of the claim[s]" until April 16, 2018, the day Progressive received the medical records that confirmed the claimants' injuries and the costs of their treatment. (Dkt. 28 at 18–19) Progressive asserts that, because Progressive tendered the policy limits two days later on April 18, 2018, Plaintiffs' bad faith action is barred under § 624.155(4)(a). Plaintiffs respond that § 624.155(4)(a) does not apply to this action. Section 624.155(4)(a) was enacted as part of recent amendments to Florida's legislation contained in House Bill 837. Plaintiffs point to

section 29 of the bill, which provides, "This act shall not be construed to impair any right under an insurance contract in effect on or before [March 24, 2023]. To the extent that this act affects a right under an insurance contract, this act applies to an insurance contract issued or renewed after [March 24, 2023]." Fla. HB 837, § 29 (2023). Plaintiff Adams's insurance contract with Progressive was renewed November 6, 2016. (Dkt. 28-8) Plaintiffs contend this litigation arises out of Plaintiffs' "right to be treated in good faith" under the insurance contract. (Dkt. 32 at 11) Thus, Plaintiffs argue the application of § 624.155(4)(a) to this litigation would impermissibly impair a right under an insurance contract in effect before March 24, 2023. (Id.) Plaintiffs also note that the application of a new law to an existing contract would violate the principles of the Contracts Clause. (Id.)

The Court finds that the application of § 624.155(4)(a) to Plaintiffs' claims is inappropriate under Florida law. "Statutes are presumed to be prospective in application unless the Legislature manifests an intention to the contrary." Fleeman v. Case, 342 So. 2d 815, 817 (Fla. 1976). Courts in the Middle District of Florida have concluded that the "language of HB 837 is clear that it applies prospectively." Mendoza v. Cardwell, No. 23-cv-1352, 2024 WL 1931472 (M.D. Fla. Mar. 7, 2024) (citing Florida trial court decision, Louis v. Sprint, No. 2019-ca-9237-O, at *4 n.1 (Fla. 9th Cir. Ct. Jul. 17, 2023)); Goldsmith v. Travelers Indemnity Co. of Am., No. 21-cv-2656-JSM-SPF, 2024 WL 128017 (M.D. Fla. Jan. 11, 2024); McConnell v. Costco Wholesale Corp., No. 22-CV-646-TJC-MCR, 2023 WL 6439573, at *2 (M.D. Fla. Oct. 3, 2023); Pinckard v. Line, 5:22-cv-304, Dkt. 39 at 4 (M.D. Fla. Aug. 7, 2023)).

16

Indeed, "there is no indication that the legislature intended the statute to apply retroactively." McConnell, 2023 WL 6439573, at *2. However, these courts analyzed whether House Bill 837's amendments would govern the admissibility of evidence in lawsuits filed after the bill's effective date. The Court is aware of no case in which a court has decided the question presented here: whether the application of § 624.155(4)(a) to a bad faith claim affects or impairs a right under an insurance contract.

In any event, Florida law requires this Court reject the application of § 624.155(4)(a) to Plaintiffs' claims. Even if § 624.155(4)(a) could be applied to Plaintiffs' claims under House Bill 837, the Court must "reject such an application if the statute impairs a vested right[.]" Menendez v. Progressive Exp. Ins. Co., Inc., 35 So. 3d 873, 877 (Fla. 2010) (holding that "even where the Legislature has expressly stated that a statute will have retroactive application," its application is inappropriate where it would impair a vested right, create a new obligation, or impose a new penalty). The right to sue on a cause of action against an insurer for bad faith vests, typically, when the insured is found liable for a judgment that exceeds his or her policy limits. Kelly v. Williams, 411 So. 2d 902, 904 (Fla. 5th DCA 1982) ("[A] cause of action for bad faith arises when the insured is legally obligated to pay a judgment that is in excess of his policy limits."); see also Michael v. Geico Gen. Ins. Co., No. 23-cv-1650, 2024 WL 3470363, at *10 n.1 (M.D. Fla. Jul. 19, 2024) (finding that § 624.155(4)(a) barred the plaintiffs' bad faith claim where the plaintiffs' "'right' to file a bad faith action against Geico did not arise until the final judgments were entered against Grant in May 2023 (after the effective date of the statute)").

17

Here, Plaintiffs' cause of action for bad faith against Progressive accrued when the final judgments were entered against Plaintiffs on July 5, 2022 and January 17, 2023. (Dkt. 1-1) Plaintiffs' right to file a bad faith action against Progressive vested before the effective date of House Bill 837, March 24, 2023. Accordingly, the retroactive application of § 624.155(4)(a) to this action would impair Plaintiffs' vested right. Therefore, the Court must reject the retroactive application of § 624.155(4)(a) to Plaintiffs' claims.

Section 624.155(4)(a) does not apply to this case; therefore, it does not preclude Plaintiffs' bad faith action.

### b. A genuine dispute of material fact exists as to whether Progressive acted in good faith in handling the claim investigation.

Next, Progressive argues it is entitled to summary judgment on Plaintiffs' claims of bad faith because Progressive "gave fair consideration to" Salter Healy's demand. Progressive notes that it did not receive the claimants' medical bills and records until April 18, 2019, about seven months after the expiration of the settlement demand. (Dkt. 28 at 22–23) Additionally, Progressive asserts that it did not know whether Direct General would provide PIP coverage before the expiration of the demand. (Id.) Without this information, Progressive contends it could not properly evaluate the value of the claims against Plaintiffs. Progressive asserts that the undisputed facts show it "was attempting to settle the claims . . . while undergoing reasonable investigation of the BI claims." (Id. at 23) In response, Plaintiffs argue Progressive failed to exercise due care and diligence in handling the defense because its investigation was "dilatory

and deficient." (Dkt. 32 at 14) Plaintiffs provide an affidavit from Kelly Gray, an expert in insurance litigation practices, who opines that Progressive's handling of the claims violated industry standards and that Progressive breached its obligation to act in good faith. (Dkt. 32-1 at 21)

"'[I]n handling the defense of claims against its insured,' the insurer 'has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.'" Harvey v. GEICO Gen. Ins. Co., 259 So. 3d 1, 6 (Fla. 2018) (quoting Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980)).

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

Id. at 6–7 (quoting Boston Old Colony, 386 So. 2d at 785 (citations omitted)). However, an insurer "is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment." Id. at 7. Instead, the standard is "whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." Id. In making this determination, the fact finder should consider the totality of the circumstances. Id. If

a reasonable jury could find that Progressive acted in bad faith, summary judgment is inappropriate. Id.

In this case, evidence in the record would allow a reasonable jury to conclude that Progressive did not diligently work on Plaintiffs' behalf to avoid an excess judgment. Progressive received actual notice of the claims against Adams on July 18, 2017. (Dkt. 33 at 2) Jones called Progressive to advise that Salter Healy represented the claimants, who reported bodily injury. (Id.) Sanchez conducted the first review of the bodily injury claims one month later, on August 16, 2017. (Dkt. 28-3; Dkt. 28-21 at 12:21-23; 14:22-15:1) Based on her review of the claim file, Sanchez determined the impact of the crash was "moderate-to-hard." (Dkt. 28-21 at 15:15-24) Sanchez left a message for Salter Healy asking for information about one of the claimants' injuries. (Dkt. 28-21 at 16:4-9) Sanchez also called Direct Insurance to determine whether the claimants had PIP coverage. (Dkt. 28-21 21:17-24) On August 17, 2017, Sanchez sent letters to Adams and Scott asking them to verify their insurance coverages. (Dkt. 28-6) Sanchez also sent a letter to Salter Healy requesting the claimants' execution of medical authorization forms and any medical bills or reports in its possession. (Dkt. 28-7)

Then, according to the claim file, Sanchez took no other action to investigate the claim until September 22, 2017, even though Progressive received the claimants' demand letter on August 30, 2017. (Dkt. 28-3; Dkt. 28-21 at 39:3-41:22) The demand letter contained the claimants' executed medical authorizations, (Dkt. 28-9), but Sanchez did not use these authorizations to request medical records from the

20

claimants' providers until three business days before the demand expired. (Dkt. 28-3 at PRG 13, 10:20 AM) After doing so, Sanchez never followed up with the providers to request they send the records pursuant to the authorizations. Even after Salter Healy extended the deadline until October 5, 2017, Sanchez did not follow up with the providers.

Significantly, during her deposition, Sanchez testified she was fired from Progressive in 2019. (Dkt. 28-21 at 58:11-17) She testified that her performance review for the year 2017 indicated she needed improvement in efficiency, timeliness, compliance with best practices, and control of daily activities. (Dkt. 28-21 at 59:1-60:18) Sanchez's manager wrote that Sanchez's deficiencies directly impacted her file quality. (Dkt. 28-21 at 60:12-18) The manager also wrote that the accuracy and quality of Sanchez's work needed improvement. (Dkt. 28-21 at 60:19-25) Sanchez's manager wrote, "My observations and supporting documentation supports you are not routinely timely in completing your intakes and investigations within our best practices, affecting the overall quality of the file[.]" (Dkt. 28-21 at 61:8-16)

Plaintiffs' expert, Kelly Gray, opines that the undisputed facts show Progressive's investigation of the claims violated industry standards. She notes that Progressive waited 29 days to open bodily injury liability claims or to begin an investigation after receiving notice of the claims. (Dkt. 32-1 at 13) She states: "This violated industry standards for the proactive and prompt investigation of claims. The injury claims should have been opened upon first notice of loss with immediate efforts at investigation." (Id.) Ms. Gray opines that Progressive's delay in requesting records

21

from the claimants' providers, and its failure to follow up on its requests until the lawsuit had already been filed, constituted "a critical failure to comply with industry standards." (Id.) Likewise, Ms. Gray notes that Progressive's failure to follow up on its requests to Direct General for medical records and billing was unreasonable. (Id.) Sanchez knew that Direct General possessed the claimants' medical records and bills on September 22, 2017, but she never followed up with Direct General on her request. (Dkt. 28-3 at 13) Ms. Gray also opines that if Progressive had followed up with Direct General on October 5, 2017, the day of Salter Healy's demand deadline and Direct General's meeting to discuss the claimants' PIP coverage, it is likely Progressive would have learned that Direct General had decided to deny coverage. (Dkt. 32-1 at 14) This knowledge would have assisted Progressive in determining the amount of the claimants' demand for which Plaintiffs were liable.

Plaintiffs designate specific facts to rebut Progressive's claim that no reasonable jury could find Progressive violated its duty of good faith. Viewing the evidence in the light most favorable to Plaintiffs, Progressive's delay in requesting records from the claimants' providers and from Direct General exhibits a failure to "diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." Harvey, 259 So. 3d at 7. A jury could find this delay was particularly dilatory in light of Progressive's deadline to respond to the demand letter. Plaintiffs' evidence that Sanchez, the employee charged with handling the investigation of the bodily injury claims, received criticism for her failure to timely investigate claims on her docket and was later fired from Progressive further supports

22

Plaintiffs' allegation of bad faith. Plaintiffs show a genuine dispute of material fact exists as to whether Progressive discharged its duty to handle the claim investigation with due care and diligence. Accordingly, summary judgment is inappropriate.

### c. Summary judgment is not appropriate on the basis that Progressive believes it never had a realistic opportunity to settle.

Finally, Progressive argues it cannot be found to have acted in bad faith because the claimants never presented Progressive with a "realistic opportunity to settle." (Dkt. 28 at 23) Progressive contends that under Florida law, "an insurer who does not have a realistic opportunity to settle the claim cannot be found to have acted in bad faith as a matter of law." (Id.) In support of this proposition, Progressive cites RLI Insurance Company v. Scottsdale Insurance Company, 691 So. 2d 1095, 1096 (Fla. 4th DCA 1997). Progressive notes that Salter Healy's demand letter was not an unconditional offer. (Dkt. 28 at 24) The letter stated that upon Progressive's tender of the policy limits, Salter Healy would meet with the claimants, and "then let [Progressive] know whether we will be able to complete the settlement." (Dkt. 28-9 at 2) Additionally, Progressive maintains that it never received sufficient information to evaluate the value of the claims before the demand expired. (Dkt. 28 at 24–25) Also, Progressive asserts that "[a]t minimum, this Court should find that there was never a realistic opportunity to settle the BI claims against Scott because Scott was never mentioned in the demand, and at no point throughout the claims handling did Rivera state that the claimants were willing to settle the claims with Scott." (Id. at 24 n.10) For these reasons, Progressive asserts it was never presented a realistic opportunity to settle.

In response, Plaintiffs dispute Progressive's representation of RLI Insurance Company's holding. (Dkt. 32 at 18) Plaintiffs also point to evidence in the record of Progressive's missed opportunities to engage in settlement negotiations. (Id. at 19–20)

Under Florida law, "[t]he lack of a formal offer to settle does not preclude a finding of bad faith." Powell v. Prudential Prop. & Cas. Ins. Co., 584 So. 2d 12, 14 (Fla. 3d DCA 1991). "Bad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause." Id.; see also Goheagan v. Am. Vehicle Ins. Co., 107 So. 3d 433 (Fla. 4th DCA 2012). "In a case '[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.'" Harvey, 259 So. 3d at 7 (quoting Powell, 584 So. 2d at 14). More generally, however, an insurer has an affirmative duty to investigate possibilities of settlement. See Powell, 584 So. 2d at 14 (citing Alt v. Am. Fam. Mut. Ins. Co., 71 Wis. 2d 340, 348–49 (Wis. 1976) (noting the affirmative duty to investigate "should impel a determination [by the insurer] of whether liability is clear and whether the exposure may jeopardize the insured by being in excess of the policy limits")).

Viewing the evidence in the light most favorable to Plaintiffs, a genuine dispute of material fact exists as to whether Progressive conducted a proper investigation of the claims to determine whether settlement was possible. That is to say, a reasonable jury could infer bad faith from the record evidence of Progressive's delay in investigating the claims and attempting to settle. Summary judgment is, therefore, inappropriate.

## IV.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendant Progressive's Motion for Summary Judgment, (Dkt. 28), is **DENIED**.

2. The Clerk is **DIRECTED** to **LIFT THE STAY and REOPEN** this case.

3. The Court will enter an amended case management and scheduling order by separate notice.

**DONE** and **ORDERED** in Tampa, Florida, this 4th day of November 2024.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person